FILED

2014 Mar-31  PM 05:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **JACK WATSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 5:11-CV-2560-SLB** |
| | ) | |
| **DAY & ZIMMERMANN NPS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

This case is before the court on Motion for Summary Judgment filed by defendant Day & Zimmermann NPS, Inc. (Doc. 52.)[1] Plaintiff Jack Watson alleges that DZ, his former employer, discriminated against him because of his age in violation of federal law. Upon consideration of the Motion, the supporting and opposing memoranda, arguments of counsel, and the relevant law, the court finds, for the reasons stated below, that defendant's Motion for Summary Judgment, (doc. 52), is due to be denied.

## I.  SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.

---

[1]Reference to a document number, ("Doc. ___"), refers to the number assigned to each document as it is filed in the court's record.

56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact and that it is therefore entitled to judgment as a matter of law.  *See Celotex*, 477 U.S. at 323*; Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has met its burden, Rule 56(e) of the Federal Rules requires that the nonmoving party go beyond the pleadings and show that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(e); *see also Celotex*, 477 U.S. at 324-25.  "There is a genuine issue of material fact if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor."  *Waddell*, 276 F.3d at 1279; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.  Determining credibility, weighing evidence, and drawing legitimate inferences from the facts are all functions of the jury, *see id.* at 255; therefore, the court must accept as true all evidence favoring the nonmoving party and draw all justifiable inferences from the evidence in that party's favor.  Nevertheless, the nonmoving party need not be given the benefit of every inference but only of every *reasonable* inference.  *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

2

## II. <u>STATEMENT OF FACTS</u>

### A.    GENERAL BACKGROUND

Browns Ferry Nuclear Plant is the largest boiling water reactor nuclear power station in the United States.  (Melvin Depo. [docs. 54-2 and 54-3] at 61.)  Tennessee Valley Authority [TVA] operates the station and supplements its labor force by retaining contractors, such as DZ, to perform portions of the plant's maintenance work.  (*Id*. at 65.) DZ is a power maintenance contractor for nuclear, fossil fuel, and hydroelectric facilities in the United States, including Browns Ferry.  (Doc. 36 ¶ 6.)  Plaintiff Jack Watson was born in 1945, (Watson Depo. [doc. 60-1] at 8), and began working with TVA at Browns Ferry in 1971 as a pipefitter, (doc. 23 ¶ 10).  He remained employed with TVA for approximately 30 years, eventually attaining the position of Maintenance Production Manager, Mechanical, and retired in December 2000.  (Watson Depo. at 12.)  His "retirement" lasted all of one weekend and he began working for a contractor at Browns Ferry the following Monday.  (*Id*. at 17.) Watson continued to periodically work for various subcontractors.  (Doc. 23 ¶ 11.)  He went to work for DZ on December 22, 2009.  (*Id*.)

The Project Maintenance and Modifications Agreement [PMMA] between TVA and its contractors covers and describes general personnel matters.  (Doc. 54-5; Collins Depo. II [doc. 54-6] at 41.)  Under the PMMA, DZ hired employees at Browns Ferry as either "augmented" or "task-managed" workers.  (Doc. 54-5 at 3.)  "Augmented" workers, while technically DZ employees, are supervised by and receive their work assignments from TVA

managers or supervisors; "task-managed" workers are supervised by and receive their work assignments from DZ contractors or supervisors.  (Doc. 54-5 at 3; Melvin Depo. at 77-78; Collins Depo. II at 42.)  During his employment with DZ, Watson received about 90% of his directions from TVA.  (Watson Depo. at 20.)  Watson last worked for DZ as a Supervisor on the Fire Protection Project, spending most of his time "in the field" with his subordinates. (*Id*. at 21-23.)

On July 26, 2010, DZ hired John Melvin as its Site Manager at Browns Ferry. (Melvin Depo. at 59, 64.)  Melvin was thirty-eight years old.  (*Id*. at 12.)  As Site Manager, Melvin supervised all DZ projects and employees at Browns Ferry and had authority to discipline DZ employees for work rule violations.  (*Id*. at 64, 87-88, 115.)  However, Watson testified that Melvin did not observe his job performance in the field.  (Watson Depo. at 26.) As part of his job as Site Manager, Melvin exercised his "management judgment" to apply the DZ's "job site work rules" in determining the severity of the discipline to be imposed. (Melvin Depo. at 115-16, 205-06.)  He testified that he did not have, and he did not exercise, discretion to stray from the job site work rules in disciplining employees.  (*Id*. at 125-26.)

Shortly after Melvin arrived at Browns Ferry, David Cox, the other DZ Supervisor assigned to the Fire Protection Project, introduced himself to Melvin.  (Cox Depo. [doc. 60-2] at 56-57.)  Cox was 62 years old at the time.  (*Id*. at 8.)  He informed Melvin that he had retired from TVA in 2004, that he had been performing contracting work at Browns Ferry since his retirement, and that he was willing to help Melvin in any way possible.  (*Id*. at 56-

57.)  Melvin told Cox that "the *old* station personnel . . . were the problem" for him and DZ. (*Id*. at 57 [emphasis added].)  Melvin later told Watson that he "found that *old* station hands did not conform to the company's expectations." (Watson Depo. at 23 [emphasis added].) Watson testified that he asked Melvin what expected qualities he was missing and Melvin had turned around and walked away without responding. (*Id*.)  Later, Watson had another conversation with Melvin.  He testified that Melvin came up to him and said, "Watson, you got a problem working for me?;" to which Watson replied, "No, why?"  (*Id*. at 24.)  Melvin said, "Your age." (*Id*.)  Watson said, "Well, son, how old are you?," and Melvin said, "Thirty-eight." (*Id*.)  Watson then said, "Well, but I'm not but sixty-five, have you got a problem with me working for you?" (*Id*.)  Melvin did not answer, but "turned red as [a] Coke can" and walked away. (*Id*.)

The last week in August 2010, Watson's subordinate pipefitters were working on an underground fire protection valve. (*Id*. at 31-32; Melvin Depo. at 283-85.)  Accessing the valve required removing a grate above a trench. (Watson Depo. at 31.)  The grate was not bolted down or secured. (*Id*.)  According to Melvin, certain tasks were required to be performed by certain crafts per trade agreements. (Melvin Depo. at 282-83.)  These task requirements are referred to as "jurisdictional boundaries." (*Id*. at 282.) Removing the grate was a task required to be done by the iron workers rather than the pipefitters. (*Id*. at 281-85; Watson Depo. at 31-32.)

When a jurisdictional boundary is violated, a representative for the craft can file a grievance seeking compensation, such as lost wages). (Melvin Depo. at 278-79; doc. 60-17.) Ricky Davis was the Iron Workers Shop Steward at Browns Ferry.  (Melvin Depo. at 285-86.)  Davis filed a grievance with Melvin a grievance and statement, dated September 1, 2010, that stated: "2 Iron Workers were called early morning [and] late afternoon [August 23 through August 27] to [r]emove and [r]einstall grating for Fire Protection project in switchyard Fire House.  When contacted about [Saturday] work [August 28], we were told we [were not] needed.  Grating was [r]emoved and [r]einstalled by others." (Doc. 60-17 at 5-6.)  Apparently, a pipefitter under Watson's supervision, Steve Cabiness, removed  and reinstalled the grate.  (Watson Depo. at 38-39.)

Melvin investigated the iron workers' grievance and interviewed Davis and the pipefitters on August 30, 2010.  (Melvin Depo. at 286.)  According to Melvin, Davis told him that he had called Watson to ask if the iron workers would be needed on Saturday and that Watson had told him, "no.'  (*Id*. at 287.)  Melvin testified he had interviewed Watson and Watson had told him "that originally he didn't plan on working this particular valve, but he made the decision on the weekend to go and work this valve . . . ."  Watson told Melvin, according to Melvin's testimony, that he had "sent his [pipefitters] down there to work the valve" on August 28.   (*Id*. at 288.)  Watson, however, denies Melvin's version of their interview. (Doc. 60-25 at 3-4.) Watson testified that, during the interview, he had "informed Mr. Melvin that Jerry Landsdale made this decision and directed the work without ever

informing [Watson] or consulting with [Watson] about it." (*Id*.)  Landsdale was in his fifties

at the time.  (Melvin Depo. at 316.)  Watson testified that he had been at Browns Ferry on

August 28, but he was not in the area where the grate was moved.  (Watson Depo. at at 29.)

On September 13, 2010, Melvin met with Davis and a TVA representative, and they

agreed to settle the iron workers' grievance by paying the two iron workers ten hours at

overtime rates for the missed assignment.  (Doc. 60-17 at 5.)  TVA was responsible for

paying the iron workers.  (Melvin Depo. at 294.)  Melvin testified that he believed this

incident damaged DZ's reputation.  (*Id*.)

On September 24, 2010, Melvin terminated Watson.  (Watson Depo. at 46-47.)

According to Watson, Melvin told him that he had exercised poor jurisdictional judgment by

allowing the pipefitters to move the grate instead of the iron workers. (*Id*. at 28-29.)  Watson

told Melvin that he had no knowledge of the incident until days later. (*Id*. at 29.)  He asked

Melvin how he could have made a poor judgment call about jurisdiction without knowing

about the moving of the grate; Melvin did not respond.  (*Id*.)  During this meeting, Melvin

did not tell Watson that he was being fired for failing to "provid[e] supervisory oversight in

the field." (*Id.* at 47.)  In his deposition, Melvin denied that Watson had told him he had

nothing to do with moving the grate.  (Melvin Depo. at 261.)  However, he conceded that the

grate could have been moved by pipefitters without Watson's knowledge.  (*Id*. at 265.)

Melvin characterized Watson's conduct as a category 2  violation of DZ's work rules,

which can result in immediate termination at the discretion of the DZ Site Manager.  (*Id*. at

299; doc. 60-18 at 1; doc. 60-23 at 15.)   Watson had no documented work-rule violations

before this incident, and, although Melvin testified that he had "other issues" with Watson,

these other issues were not the basis of his decision to terminate Watson.  (Melvin Depo. at

298-99.)   On the violation report, Melvin described the violation as "[u]ndermining the

reputation, standing, or favorable perception of the company by the owner.  Jurisdictional

boundaries were crossed leading to grievance." (Doc. 60-18 at 1.)  Watson did not sign the

violation report.[2]  (Watson Depo. at 46).  Melvin suspended Landsdale for three days as a

result of incident.  (Melvin Depo. at 315.)  He testified:

> Q. . . . [W]hy did you suspend [Landsdale] for three days?
>
> A.  He was on site, had the opportunity to call it, as well as Jack Watson.
>
> Q. So this is the same incident for which you terminated Mr. Watson?
>
> A.  Correct.
>
> . . .
>
> Q.  Why did you only suspend Mr. Landsdale and you terminated Mr. Watson?
>
> A.  Mr. Watson had the sole responsibility of the project.
>
> Q.  Well, if he had sole responsibility for the project, why did you suspend Mr. Landsdale at all?
>
> A.  He had a portion of it.

---

[2]Although someone signed "Jack Watson" for the employee's signature on the report, Watson testified it was not his signature.  (Doc. 60-18; Watson Depo. at 46.)

Q.  So he didn't have the sole responsibility for the project?

A.  Over Mr. Landsdale, he was responsible for Jerry [Landsdale].

(*Id*. at 315-16.)

Melvin fired Cox the same day he fired Watson, but his grounds for Cox's termination were not related to those for Watson's termination.  (*See* Melvin Depo. at 164.)

Cox testified that, at the time, he and Watson left, the major work on the Fire Protection Project was completed, but that he had expected that a crew would continue to work on the project to tie up loose ends.  (Cox Depo. at 73-74.)  Cox was told that Josh Normand became supervisor over the Fire Protection Project, followed by Jason Hovater. (*Id*. at 73; *see also* doc. 60-39 ¶ 2.)  Normand was at least six years younger than Watson, (Melvin Depo. at 167), and Hovater was in his early forties, (*see* doc. 60-39 at 4).  In an email sent to a TVA official on the day of Watson's termination, Melvin stated that "Ryan Collins is working with Brooks [Patterson] to back fill the supervisory slots left from Dave Cox and Jack Watson."  (Doc. 60-19; Melvin Depo. at 314.)  Brooks Patterson was "the task manager put in place [by TVA] to assist with the project," (Melvin Depo. at 105), and was in his early forties, (*id*. at 309-310).  Melvin testified that he could not say who "solely" replaced Cox and Watson, but "it was probably Jeff Armstrong and Ryan Collins."  (*Id*. at 313.)  Ryan Collins was thirty-five at the time.  (Collins Depo. I [doc. 60-20] at 13.)  Jeff Armstrong was in his "mid to late fifties," and more than six years younger than Watson. (*See* Melvin Depo. at 181.)  Melvin also testified that there were numerous supervisors on

site, and that he thought Jim Davenport took over a portion of Cox and Watson's work. (*Id.* at 324.) Jim Davenport was sixty-five at the time of Melvin's deposition. (*Id.*) Hovater testified Normand and Armstrong assumed the supervisory duties of Watson and Cox. (Doc. 60-39 ¶ 2.)

Melvin testified that DZ did not have a "record-keeping process of who is assigned where." (*Id.* at 325.) In any case, Watson's position was not eliminated and someone had to fill his role. (*Id.* at 314-15.)

## III. ANALYSIS

Plaintiff claims defendant terminated him in violation of the Age Discrimination in Employment Act [ADEA], which prohibits certain employers from discriminating against employees "because of [their] age." 29 U.S.C. § 623(a)(1). In the absence of direct evidence of discrimination, *see*, *e.g.*, *Earley v. Champion International Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) ("Fire Earley—he is too old"), these cases are typically analyzed using the *McDonnell Douglas* burden-shifting method, *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000). Under *McDonnell Douglas*, a plaintiff must establish a prima facie case of age discrimination, which shifts the burden to the defendant to put forth a legitimate, nondiscriminatory reason for the adverse action. *Id.* If the defendant does so, the burden shifts back to the plaintiff to show that the reason is pretext. *Id.*

Defendant points to *Stanfield v. Answering Service, Inc.*, 867 F.2d 1290, 1293 (11th Cir. 1989), which states that a plaintiff can show a prima facie case by proving that "(1)

plaintiff was a member of a protected group, (2) plaintiff was discharged, (3) plaintiff was

replaced with a person outside the protected group, and (4) plaintiff was qualified to do the

job." Defendant argues that plaintiff cannot satisfy the third element for two reasons:

> First, no one was hired to replace [p]laintiff. The project for which [p]laintiff
> was hired was near its end, having concluded on October 29, 2010, and other
> employees were used to assume parts of [p]laintiff's job duties for a short
> period of time. Second, no single person assumed [p]laintiff's duties. Instead,
> [p]laintiff's duties were spread among several employees. . . . All [but one of
> them were] in the protected category of age.

(Doc. 53 at 22-23) (internal citations omitted).

This argument fails. To establish a prima facie case of discrimination under the

ADEA, plaintiff is not required to prove that he was replaced by someone under 40; rather,

he must prove that he was replaced by someone that was "substantially younger." *O'Connor*

*v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996)(holding that whether replacement

is "substantially younger than the plaintiff" is the true test); *see*, *e.g., Carter v. DecisionOne*

*Corp*, 122 F.3d 997, 1003 (11th Cir. 1997)(holding that three years younger can be

"substantially younger"). "[A] plaintiff may demonstrate that he was replaced when another

employee assumes the plaintiff's responsibilities in addition to their own responsibilities after

the plaintiff is terminated." *Vahey v. Philips Electronics North America Corp.*, 461 Fed.

Appx. 873, 875 n.3 (11th Cir. 2012)(citing *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529

(11th Cir. 1987)).[3]

---

[3]Eleventh Circuit Rule 36-2 provides, in pertinent part, "An opinion shall be
unpublished unless a majority of the panel decides to publish it. ***Unpublished opinions are***

Defendant asserts, as an undisputed fact, that "Watson was probably replaced with Ryan Collins." (*Id*. at 16.)  Collins was substantially younger than Watson.  Therefore, for purposes of deciding defendant's Motion for Summary Judgment, the court finds that Watson has presented sufficient evidence to satisfy a prima facie case of age discrimination.

Defendant contends that it is entitled to judgment as a matter of law because plaintiff cannot rebut its articulated reason for his termination – that it terminated plaintiff of the pipefitters moving the grate.  Specifically, it argues, "After completing his investigation, Melvin determined that the violation was a Category 2 violation, subsection (q), 'undermining the reputation, standing or favorable perception of the company by the owner.' Jurisdictional boundaries were crossed leading to a grievance." (Doc. 53 at 24.)  This is sufficient to carry defendant's "exceedingly light" burden to provide a legitimate, non-discriminatory reason for termination.  *Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1061 (11th Cir. 1994).

Watson argues that he has submitted sufficient evidence show that DZ's articulated reason for his termination was a pretext and that the real reason was his age.  This evidence includes Melvin's comments regarding "old" TVA employees, the termination of Cox, also over 60 years old. on the same day but for allegedly different reasons, Melvin's erroneous conclusion that Watson had exercised poor judgment because he had "exercised no

---

*not considered binding precedent, but they may be cited as persuasive authority*."  11th Cir. R. 36-2 (emphasis added).

judgment" with regard to moving the grate, and evidence that termination was a "wildly

harsh disciplinary action" in response to a grievance.  (Doc. 59 at 38-41.)  To establish

defendant's articulated reason is a pretext under *McDonnell Douglas* –

> the plaintiff [must] ". . . demonstrate that the proffered reason was not the true
> reason for the employment decision." [*Dep't of Cmty. Affairs v. Burdine*, 450
> U.S. 248,] 256 [(1981)].  The plaintiff "cannot recast the reason but must meet
> it head on and rebut it."  *Wilson* [*v. B/E Aerospace, Inc.*], 376 F.3d [1079,]
> 1088 [(11th Cir. 2004)].   The plaintiff must show "weaknesses,
> implausibilities, inconsistencies, incoherencies, or contradictions" in the
> employer's rationale.  *Combs* [*v. Plantation Patterns*], 106 F.3d [1519,] 1538
> [(11th Cir. 1997)] (quotation marks omitted).

*Holland v. Gee*, 677 F.3d 1047, 1055-56 (11th Cir. 2012).

Defendant points out that one way to show that a proffered reason is pretext is by

showing that the plaintiff "did not violate the cited work rule; or . . . [that] other employees

outside the protected class who committed similar violations were not similarly treated."

(Doc. 53 at 25-26 [citing *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354,

1363 (11th Cir. 1999)].)  Defendant argues that here, "the focus is on the first prong," and

since Melvin had a "non-pretextual belief that plaintiff caused employees to work outside of

their jurisdiction, resulting in a grievance and the payment of employees who did not actually

perform any work," plaintiff cannot demonstrate pretext.  (*Id*. at 26.)

> [T]he *Damon* Court held that, in a discrimination case where the employer
> asserts that the employee violated a work rule, the employee may show pretext
> by demonstrating that he or she did not violate the work rule.  However, . . .
> this first *Damon* method is inapplicable in this action.
>
>    That part of the *Damon* holding, which allows a plaintiff to establish
> pretext by demonstrating that the work rule violation did not occur, applies in

cases where the decisionmaker observes the alleged work rule violation and, thus, has personal knowledge thereof. Where, as here, the decisionmaker . . . does not have personal knowledge of the work rule violation, but rather relies on second-hand information that an employee committed the violation, a different rule applies. In this scenario, an employee cannot demonstrate pretext merely by showing that the work rule violation did not occur and that, therefore, the information relied upon by the decisionmaker is false. That is because, in cases where the decisionmaker does not witness the alleged infraction, "[a]n employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct." In other words, whether or not a plaintiff actually committed the work rule violations is immaterial on the issue of pretext. Rather, what is material is whether or not the employer believed the allegations to be true, not whether they were in fact true.

Thus, to establish pretext, the employee must show more than facts establishing that he or she did not commit the work rule violation. The employee must point to evidence which raises a question as to whether the decisionmaker, in fact, knew that the violation did not occur and, despite this knowledge, fired the employee based upon the false premise of an alleged work rule violation. . . .

*Sweeney v. Alabama Alcoholic Beverage Control Bd.*, 117 F. Supp. 2d 1266, 1272-73 (M.D. Ala. 2000)(internal citations and footnote omitted).

The evidence in this case indicates that Melvin knew or had reason to know that Watson did not order the pipefitters to move the grate. Indeed, he knew or should have know that Landsdale was responsible for giving the order to move the grate to the pipefitters. Nevertheless, Melvin testified that he terminated Watson because Watson was responsible for Landsdale. Therefore, the fact that Watson did not order the pipefitters to move the grate or know that Landsdale had so instructed them does not prove that Melvin's decision to

14

terminate him based on his responsibility for the actions of Landsdale and the pipefitters was a lie.

Watson, Collins, and Cox testified that they are unaware of any supervisor who has been terminated as a result of a grievance filed about a jurisdictional boundary dispute among craftsmen. Although a reasonable jury could find that Melvin chose an extreme discipline in the case of Watson that had nothing to do with Watson's age, it could also infer that Melvin did not terminate Watson for the grievance – because the decision termination is out of proportion with the alleged wrong. As set forth above, a plaintiff may establish his employer's explanation is a pretext based on "weaknesses [and] implausibilities . . . in the employer's rationale." *Holland*, 677 F.3d at 1055-56. "[T]he less sensible an employer's decision appears to be, the more likely it is that the jury will not credit it." *See Artis v. Hitachi Zosen Clearing, Inc.*, 967 F.2d 1132, 1140 (7th Cir. 1992). Testimony that supervisors are not terminated based on boundary grievances is evidence from which a reasonable jury could find that DZ's articulated reason for terminating Watson was not credible.

Moreover, the court finds that a reasonable jury could find Melvin's comments regarding "old" employees of TVA reflected age-based animus. While Melvin's comments are not direct evidence that he terminated Watson because of his age, the evidence of Melvin's comments to Cox and Watson and his termination of both men at the same time – as well as evidence as to the weakness or implausibility of terminating Watson based on a

grievance over jurisdictional boundaries between craftsmen – is sufficient circumstantial

evidence to support a jury verdict in favor of Watson on his age discrimination claims.[4]

*Wilson*, 376 F.3d at 1091 ("Language not amounting to direct evidence, but showing some

[discriminatory] animus, may be significant evidence of pretext once a plaintiff has set out

the prima facie case.") (internal quotation marks and citations omitted).

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are material facts in

dispute and defendant is not entitled to judgment as a matter of law.  An Order denying

defendant's Motion for Summary Judgment, (doc. 52), will be entered contemporaneously

with this Memorandum Opinion.

**DONE**, this 31st day of March, 2014.

Sharon Lovelace Blackburn

SHARON  LOVELACE  BLACKBURN
UNITED STATES DISTRICT JUDGE

---

[4]The court notes that the evidence is not such that a reasonable jury would be
compelled to find in favor of Watson.  Certainly, the jury does not have to view the evidence
in the light most favorable to Watson and presumably defendant will offer some justification
for terminating Watson based on a grievance when no other site manager had made the same
decision.  The jury may also find that when Melvin referred to "old station personnel" he was
not referring to the age of the employees, but the length of time they had worked for the
company.  However, the court, viewing the evidence in the light most favorable to Watson,
the non-movant, and drawing all reasonable inferences in his favor, finds the evidence is
sufficient to support a jury verdict in favor of Watson and against DZ on Watson's
termination claim.